431 F.Supp. 155 (1977)
In the Matter of IMPERIAL `400' NATIONAL, INC.
No. 656-65.
United States District Court, D. New Jersey.
March 16, 1977.
*156 *157 *158 *159 Crummy, Del Deo, Dolan & Purcell by Michael R. Griffinger, Newark, N. J., for trustee.
Eugene L. Boyle, Clifton, N. J., trustee.
Securities and Exchange Commission by Jerome Feller and Mark Von Sternberg, New York City, for the Government.
Burton L. Eichler, East Orange, N. J., for Touche, Ross & Co.
Myron S. Lehman, Newark, N. J., pro se and for Nathan Ravin.
Justin P. Walder, Newark, N. J., for Thomas O'Neill.
Nolan, Lynes, Bell & Moore by Jerome Lynes, Newark, N. J., for Joseph Nolan.
Saiber, Schlesinger & Satz, Newark, N. J., pro se and for `400' Group and Imperial Associates.
Bernard Hellring, Newark, N. J., for Stockholders' Committee.
Walsh & Levine by Laurence W. Levine, New York City, for Union Bank.
Meth, Wood, Neff & Cooper by Theodore S. Meth, Newark, N. J., for Co-owners Committee.
Sheldon Schachter, Newark, N. J., for General Unsecured Creditors' Committee.
Sidney M. Markley, Fort Lee, N. J., Charles A. Stanziale, Jr., East Orange, N. J., for Continana Corp.
Riker, Danzig, Scherer & Debevoise by Alvin Weiss, Newark, N. J., for General Tire Pension Funds.
Bernard A. Kuttner, Newark, N. J., for Estate of Charles Handler.
Carter, Ledyard & Milburn by Jack Kaplan, New York City, for Schiavone Construction Co.
Hannoch, Weisman, Stern & Besser by Ronald M. Sturtz, Newark, N. J., for Schiavone Construction Co.
Sanford Silverman, Newark, N. J., pro se and for Edward Walsh, Chapter XI Receiver.
Pitney, Hardin & Kipp by Roger C. Ward, Newark, N. J., for Marine Midland Trust Co., indenture trustee.
Cole, Berman & Belsky by Morrill J. Cole, Paterson, N. J., for Burnham Group.

OPINION
WHIPPLE, Chief Judge.
There are presently before the Court 21 separate applications for allowances in this *160 Chapter X reorganization proceeding. These applications have been submitted for services rendered over varying part of the 11 year period during which this enterprise was operated under the aegis of court protection briefly under Chapter XI and for the rest of the period under Chapter X. The proceedings culminated in a confirmed plan of reorganization which has been in the process of consummation since the date of confirmation. Creditors have received 100 cents on the dollar in cash, notes and/or stock, and former stockholders have received one share of new stock, with an investment value of $4.89 per share, for every three shares of old stock. I have previously expressed my views on the fairness and feasibility of the plan, and its overwhelming acceptance, together with the absence of appeals from my plan determinations, indicates to me that the reorganization has finally concluded successfully.
Many of the applicants contributed to this success. It is virtually impossible to pinpoint those applicants who may have been most responsible or the principal catalyst in achieving this result. I believe that all participants were of assistance to both the Court and the proceedings, even when one party's interests were adversary to those of another party. I received cooperation from each and every professional involved in this case, and the result was a blending or balancing of interests to reach the final outcome achieved here. While there is no question that some of the actors were more center-stage than some of the supporting players, I feel that the overall performance is the true measure of the cast, and I am happy to applaud the show. While the finale may have been long in coming, it was a happy ending.
I will now proceed to a brief review of the criteria I have considered in analyzing the applications, and I will then deal with the specific allowance requests.

General Principles
In evaluating the various requests for allowances that are on file and before me for consideration, I have had the benefit of the submissions of various parties to these proceedings. Counsel for the Trustee has submitted a comprehensive memorandum pertaining to the general principles applicable to request for allowances, other counsel have made submissions, and the S.E.C. has submitted a memorandum outlining what it considers to be the relevant considerations and principles of law that bear upon the pending applications. The S.E.C. declined to make specific recommendations on the amounts to be awarded to the applicants.
The foregoing submissions, as well as decisions in the within proceedings by the United States Court of Appeals for the Third Circuit[1] and the District Court, have furnished me with considerable guidance. It is unnecessary to restate the principles contained in those source materials in any depth. Rather, I would note that my determinations on the individual applications took into account all of the principles enunciated therein, and I have considered each and every application from the standpoint of the time expended (and the quality of the time records maintained), the benefits conferred upon the estate by the work performed, the degree of difficulty of that work, the results accomplished, the standing of the particular professional performing the work both within his professional community and as a professional skilled in reorganization proceedings, and the other criteria enunciated in the numerous cases cited by counsel.[2]
*161 As a result of my consideration of all the fee criteria, different applicants will be compensated at different rates, i. e., a comparison of hourly rates reached by dividing the hours claimed into the total compensation, will show disparate results. No uniform hourly rate can be applied because of the numerous factors that must be carefully considered. Moreover, in making these awards I have taken into account the specific time period during which the services were rendered by respective applicants, the hourly rates that were in effect during those time periods, the fact that many of the applicants have been waiting many years for compensation in this proceeding without having had the benefit of the use of that compensation contemporaneous with the rendering of the services, the aggregate amount that I deem to be the reasonable total compensation to be awarded in these proceedings (see discussion, infra) and other intangible factors that only a presiding reorganization judge is in a position to evaluate.
In summary, after applying all of the foregoing criteria, I have attempted to encourage the participation by all parties in interest to work toward the successful conclusion of the reorganization,[3] without indiscriminately compensating applicants who have merely been active, but have not satisfactorily met the tests enunciated in the authorities cited above.[4]

BERNARD KUTTNER, ATTORNEY FOR ESTATE OF CHARLES HANDLER
Charles Handler appeared in this proceeding on behalf of Continana Corporation, one of the co-proponents of the plan that was ultimately approved and confirmed by this Court. However, Mr. Handler died long before the confirmed plan was submitted. For his representation of Continana Corporation, his estate now requests the sum of $3,500, together with disbursements. No detailed time records were submitted although 37 hours of time are claimed at the rate of approximately $100 per hour. As was set forth in the case of In re Meade Land & Development Co., Inc., 527 F.2d 280, 284 (3d Cir. 1975):
"We stress that it is the attorneys obligation to keep and submit to the court time records supporting an application for compensation. And, absent unusual circumstances, it is the court's independent obligation to give credit only where there are such supporting documents, even in cases where no interested parties raise objections to the claim."
See also cases cited in submissions referred to above.
From the submissions of Mr. Kuttner, it is difficult to determine any real benefit that inured to the estate from the work of Mr. Handler. Nonetheless, it can be stated that Mr. Handler did contribute to the movement of the case and may have inspired the filing of the first plan by Continana Corporation which incorporated features that might be traced to the confirmed plan which was also co-sponsored by Continana. Accordingly, I deem the services of Mr. Handler to this creditor to be compensable and I evaluate their worth to be $1,500, together with disbursements of $214.87.

SANFORD SILVERMAN AND EDWARD WALSH
I have grouped the applications of Messrs. Silverman and Walsh together because they appear to have acted as a team during the Chapter XI phase of this proceeding. *162 Mr. Walsh was appointed receiver in the Chapter XI, and Mr. Silverman was named as his counsel. They both served for the period from June 4, 1965 through February 8, 1966, when this proceeding was converted into a Chapter X proceeding. From their collective testimony, it appears that considerable work was done by these individuals, but the quality of their performance was not uniformly high, nor were there substantial benefits traceable to their efforts.
On the affirmative side, it is clear that these gentlemen were responsible for the daily operation of the debtor and the resolution of the legal problems which also arose on a rather frequent basis during this period. They were involved in conducting an accounting analysis of the operations of the debtor, in the handling of purchase and sale negotiations and applications on behalf of the debtor, and in the frequent court proceedings which took place during the Chapter XI period.
On the negative side, there seems to have been little progress during the Chapter XI proceeding toward the molding of this enterprise into a viable, post-bankruptcy entity. Testimony taken at the hearings under Section 328 of the Bankruptcy Act for the conversion of these proceedings into Chapter X proceedings indicated that the debtor, at that time, had serious cash flow and financial problems. Moreover, the report filed by the Chapter X trustee under Section 167(5) of the Bankruptcy Act (at pages 97-99) indicates that even the maintenance of the status quo during the Chapter XI proceedings by these fiduciaries was not effectively accomplished. That report indicates that the Grant's Pass, Oregon, motel was lost, possibly due to inaction by the receiver and his attorney, and that the Little Rock motel, which proved to be a valuable asset of the estate, had to be recovered by the trustee after the receiver and his counsel failed to assert defenses in proceedings for possession of that motel. This report and the testimony I have heard on these subjects go unchallenged. For these reasons, I am not inclined to compensate the receiver and his counsel in the amount of $25,000 each, which is their requested allowance.
Mr. Silverman has reconstructed 512 hours of services for which he seeks compensation at the rate of approximately $50 per hour. His testimony showed only a modest familiarity with the debtor's affairs, although it must be recognized that his work was performed more than ten years ago. The time spent by Mr. Silverman on plan negotiations did not prove to be fruitful or beneficial to the estate. Based on the foregoing analysis, I feel that an allowance of $7,500 is appropriate.
Mr. Walsh also requests $25,000 for what he claims to be 1,728 hours of services. Mr. Walsh testified that he spent a "minimum of 8 hours per day" in his capacity as receiver, and that he spent a "minimum of 6 days per week" in the conduct of the operations of Imperial, as well as some Sundays. It is clear that Mr. Walsh did undertake some travel on behalf of the debtor and he claims that the rest of his time was spent at the corporate offices. Assuming that all these hours were, in fact, spent, I nonetheless feel that the other aspects of his services analyzed above warrant a maximum award of $7,500.

MESSRS. SIDOLI AND GRIGG
Joseph A. Sidoli and William E. Grigg, Jr., have filed a joint application for allowance as appraisers. They were appointed by the Court as appraisers of the assets of the debtor corporations on June 8, 1965. They indicate they visited and appraised 43 of the motels in the Imperial chain. They also indicate some appraisal of personal property. The compensation they seek is for an estimated 25 man days each, for a total of 50 man days, at the rate of $150 per man day, or a total of $7,500. Their petition does not indicate that the Court had ever fixed the rate per day by which they were to be compensated, nor does their petition reflect hours spent or any detail of the work performed. However, assuming that the estimated man days are correct, it is my view that fair compensation *163 for appraisal work of this sort would be at the rate of $75 per man day and I therefore allow the sum of $3,500 to Messrs. Sidoli and Grigg for the work performed as Court-appointed appraiser. Bankruptcy Rule 10-215(c)(2).

SMOLIN, LUPIN AND COMPANY
This accounting firm requests an allowance of $2,100 based upon the performance of services at the rate of $75 per man day. The October 20, 1965 order authorizing the performance of work by this accounting firm indicated that the amount charged should not "exceed" $75 per man day. Moreover, the rates charged by this firm were $75 per day for senior and $40 per day for juniors. It is not clear from the application whether the work was performed by seniors or juniors. Moreover, some work was performed before the Court order and some was performed after Court authorization was obtained. Based on the foregoing facts and my analysis of the work performed, I feel an award of $1,000 is appropriate and reasonable.

TOUCHE ROSS & COMPANY
The accounting firm of Touche Ross & Company (formerly Puder & Puder) performed services for the debtor corporations over several years. The bulk of the moneys due to them for services performed pursuant to Court authorization have been paid, but Touche Ross furthers at this time its claim for $22,734.96 as unpaid allowances.
Two Court orders are involved. Under one Court order, Touche Ross was authorized to perform services in reviewing plans of reorganization and drawing up a three-year projection of corporate financials in connection therewith. The Court order authorized the expenditure of $35,000 plus expenses. Pursuant to this Court authorization, Touche Ross performed certain work and submitted a bill for $33,847.50. Against this bill, Touche Ross was paid $18,836.04, leaving a balance due of $15,011.46. Since this work was performed pursuant to Court order, I deem it to be compensable.
A separate claim is made by Touche Ross & Company pertaining to a bill submitted by that accounting firm in the amount of $103,129.60. Against this billing, Touche Ross received $95,460.10, and Touche Ross therefore seeks only the balance due of $7,723.50. However, the Court orders under which this compensation is sought, authorizing Touche Ross to do certain work in conjunction with financial statement preparation, tax return work, spot audits, etc., only authorized $90,000 worth of services to be performed, together with reimbursement for expenses. The expenses were $5,460.10, so that the payment of $95,460.10 to Touche Ross is payment to the full extent of the authorized services. The excess value of the services performed of $7,723.50 cannot be allowed since it must be deemed either unauthorized or additional effort to complete work which had a maximum authorization which was paid.
In sum, the application of Touche Ross is allowed to the extent of $15,011.46.

MARINE MIDLAND TRUST COMPANY
An application has been filed on behalf of Marine Midland Trust Company, the Indenture Trustee for the convertible debentures issued by the debtor prior to these proceedings. This application is really two-fold in nature; Marine Midland seeks administration expenses for its role as Indenture Trustee and also seeks reimbursement for legal fees paid to its New Jersey counsel, Pitney, Hardin and Kipp.
With respect to the first part of the application, Marine Midland seeks $6,995 which consists of the fees and expenses due to Marine Midland for the entire period of the reorganization during which they served as Indenture Trustee. This sum includes a $500 annual fee for services as Indenture Trustee, a $100 annual fee for services as registrar and related charges. In my view, these are proper administration expenses and the $6,995 request is allowed.
Marine Midland requests $13,328.99 for the services and disbursements of New Jersey counsel, Pitney, Hardin and Kipp. *164 These services appear to be in part services for Marine Midland as a client and in part for services to Marine Midland as Indenture Trustee. The application indicates that 64.5 partner hours and 284 associate hours were expended during the proceedings, and compensation is sought at the rate of $70 per partner hour and $28 per associate hour. There is no question as to the reasonableness of the hourly rates, however, a review of the application and the testimony indicates that much of the time was expended in mere attendance at Court proceedings or monitoring of other activities during the Chapter XI and Chapter X phases. It is conceded that Pitney, Hardin & Kipp did not take an active role since it viewed the responsibilities of the Indenture Trustee as basically one of minimal involvement with plan negotiations and proceedings. In fact, no position was taken on the various plans of reorganization submitted during the history of these proceedings.
Based upon the foregoing and the general principles enunciated herein, I believe an allowance of $5,000, together with reimbursement for disbursements of $793.99 should be made to Marine Midland Trust Company in partial reimbursement for the legal expenses incurred by it.

BERNARD HELLRING
Bernard Hellring was designated as counsel for the stockholders of Imperial by order dated March 8, 1973. In this capacity, Mr. Hellring undertook to represent the interests of those stockholders from the date of his appointment until the confirmation of the plan. There was some duplication of the representation of the stockholder interests by dint of the fact that a major stockholder, Continana Corporation, was separately represented. Nonetheless, Mr. Hellring and members of his firm did participate in the latter stages of these proceedings and expended the hours set forth in Mr. Hellring's application. The bulk of the time was spent by Mr. Hellring and he seeks compensation at the rate of $100 per hour. Other partner hours are sought at the rate of $75 per hour and associate time is requested to be compensated at the rate of $40 per hour, for a total fee application request of $12,825.
It is clear from the affidavit and testimony that Mr. Hellring participated in several aspects of this case that were important chapters leading to the conclusion of the proceedings. He was active in evaluation proceedings which determined the total worth of the company and thereby determined the equity that would be available to stockholders under any reorganization plan. This matter was appealed to the United States Court of Appeals for the Third Circuit, and Mr. Hellring participated in that appeal. Additionally, he was active during the hearings on the Schiavone plan which was approved by this Court although it did not obtain confirmation. He also had some discussions pertaining to the provisions of the plan which ultimately was confirmed.
For the participation as outlined above, I deem it appropriate to award Mr. Hellring the sum of $9,500, together with reimbursement for disbursements in the amount of $711.20.

RIKER, DANZIG, SCHERER & DEBEVOISE
The firm of Riker, Danzig, Scherer & Debevoise represents the largest single unsecured creditor in this proceeding, the four General Tire Pension Funds (hereinafter "General Tire"). The Riker firm has represented General Tire since the commencement of these proceedings and the time for which they seek compensation includes a small amount of time spent in the Chapter XI proceeding. The request made by the firm is for an allowance of $50,000 which represents billings over the entire length of the reorganization proceedings at the average rate of $100 per partner hour and $50 per associate hour.
There is no question that some of the services rendered by the applicant which the applicant claims caused a benefit to inure to the estate were duplicative of comparable efforts expended by the Creditors Committee and counsel for the Creditors Committee. In fact, there is no doubt that *165 the Creditors Committee and its counsel represented the interests of General Tire throughout the proceeding. The general counsel of General Tire was a member of the Executive Committee of the Creditors Committee and an active participant in the activities of the Creditors Committee.
The work for which the applicant seeks compensation includes participation in attempts to arrive at a successful plan of reorganization. In this connection, the applicant conducted active negotiations, but these negotiations were specifically on behalf of the individual client, General Tire. The fact that they inured to the benefit of Class 7A of unsecured creditors is of interest, but not critical to my consideration since General Tire comprised virtually 75% of Class 7A.
The other area for which Riker, Danzig, Scherer & Debevoise seek compensation is for its activities in connection with the repayment of interim allowances by the trustee and counsel for the trustee, as well as the repayment to the estate of interest thereon. See In the Matter of Imperial `400' National, Inc., 432 F.2d 232 (3d Cir. 1970) and 456 F.2d 926 (3d Cir. 1972). The applicant concedes that more than half of its time was spent on these matters. It should be noted, however, that the efforts in these cases, which redounded to the benefit of the estate by the replacement of operating cash into the estate pending final administration awards, were the joint efforts of counsel for General Tire, counsel for Union Bank, counsel for the Creditors Committee and included the participation of the S.E.C. While I believe that these efforts did accomplish a temporary benefit for the estate, I cannot, of course, award each participant full credit for the benefit, nor can I overstate its value in terms of dollars awarded.
In my view, the efforts of Riker, Danzig, Scherer & Debevoise were basically on behalf of a private client and only to a limited extent for the general benefit of the estate and assistance of the reorganization court. In fact, the applicant has received $28,750 in fees, together with partial reimbursement for expenses from General Tire. In light of the foregoing, I deem an award of $12,750 to be appropriate, together with reimbursement for unreimbursed disbursements to the extent of $1,952.30.

MYRON S. LEHMAN AND NATHAN RAVIN
A joint application has been filed on behalf of Myron S. Lehman and Nathan Ravin, co-counsel for the debtors. These firms rendered services to the debtor corporations prior to the filing of the initial Chapter XI proceeding, and subsequently represented the debtor throughout the Chapter XI and, to some extent, during the Chapter X proceedings. While the applicants initially received a retainer from the debtor corporations, the retainer was ordered returned by the reorganization court in 1967, and the applicants have therefore received no payment to date on account of the services they have rendered.
The early activities of these applicants, together with the question of the retention of the retainer originally taken by them, is thoroughly discussed In the Matter of Imperial `400' National, Inc., 274 F.Supp. 351 (D.N.J.1967). Portions of that opinion are pertinent with respect to the pending request for a final allowance. In that opinion, Judge Shaw stated, at page 358:
"Counsel were entitled to receive a reasonable attorneys fee `for services rendered or to be rendered' in contemplation of the filing of the petition and it might well be said in this instance that some part of the proceeds of $28,145.50 constituting a reasonable allowance should now be allowed . . ."
However, Judge Shaw declined to make an allowance at that time and concluded that:
"The extent to which the services rendered during the pendency of the reorganization proceedings were necessary and beneficial to the estate cannot be evaluated until a plan of reorganization is approved or the proceedings herein otherwise terminated." (at page 359)
Judge Shaw noted that the retainer of slightly under $15,000 each taken by both *166 Mr. Lehman and Mr. Ravin, might well have been appropriate:
"In this particular instance the Court feels that it is very likely that the amount of $14,072.75 covering services rendered in contemplation of the filing of the petition and services rendered and disbursements incurred thereafter is not unreasonable. It might well be that Ravin and Ravin will ultimately be entitled to a greater sum, but these are matters which the Court cannot determine with finality at this time." (at page 359).
Thus, notwithstanding the order of the Court that the retainer be returned to the estate in 1967, Judge Shaw did contemporaneously comment upon the reasonableness of the retainer amount taken by the applicants. Judge Shaw also noted that counsel had the use of the funds for the period from May 1965 to the date of his opinion in 1967 (August 31, 1967) and that such a factor should be considered in the ultimate award of counsel fees.
The applicants seek $100,000 in counsel fees and reimbursement for disbursements. The application asserts that in excess of 1,200 hours were expended by the joint applicant firms during these proceedings. Detail is missing with respect to substantial portions of this hourly sum, and it can be concluded that the hourly total is, in great measure, an estimate. In fact, the applicants merely estimate that from 1970 until the end of the case they expended 350 hours, and no detailed analysis of this time is submitted.
Moreover, a substantial portion of the time for which compensation is sought was performed in the Chapter XI proceedings which was superseded by the present Chapter X proceeding. In this connection, I have taken into account the comments of the S.E.C. as set forth at page 26 of their memorandum which indicates that compensation for futile efforts to promulgate Chapter XI plans should not be heavily compensated nor should opposition to the transfer motion or depletion of assets.
Furthermore, while Bankruptcy Rule 10-215(c)(2) permits compensation to attorneys for the debtor in a superseded Chapter XI proceeding, there is no clear-cut authority for awarding allowances to such attorneys for Chapter X proceeding absent specific court authorization. See Advisory Committee Note to Bankruptcy Rule 10-215(c)(2), which states that it might be improper to give "any additional allowance for such services, however, unless they were authorized by the court in advance of their performance." See also Bankruptcy Rule 10-206. While Judge Shaw did indicate in his opinion, supra, that it was contemplated that these applicants would render services in the reorganization proceeding, no specific order of appointment under Bankruptcy Rule 10-206 or its predecessor Bankruptcy Act or General Order provisions was specifically obtained.
Based upon the foregoing analysis, the general principles discussed above and in the briefs of counsel and the S.E.C., the opinion of Judge Shaw and the minimal involvement of these applicants in the latter stages of these reorganization proceedings, I believe that a fair allowance for the services of the applicants as attorneys for the debtor both prior to and during the early phases of these proceedings would be in the total sum of $52,500, together with reimbursement for disbursements in the sum of $2,682.07.

COLE, BERMAN & BELSKY
Cole, Berman & Belsky seeks an allowance for the services it has performed on behalf of the Burnham group, an entity that was both a plan proponent and held a minor stockholding interest in the debtors. Cole, Berman & Belsky has been paid in excess of $20,000 by its client for its services through the end of March, 1970 and only seeks compensation for hours and services from April 1, 1970 until the end of the case. The application is based upon the expenditure of 430.5 recorded hours although the applicant asserts that more than 100 additional hours of unrecorded time were also expended.
The applicant asserts it benefited the estate in the following manner:

*167 "I think the estate benefited from the independent research advice, consultation and work that was done both outside and inside of the Court room in proposing the Burnham plan, proposing, working on in conjunction with the Creditors Committee and stockholders, and of the elimination of plans that I think would have been seriously detrimental to the interests of Imperial `400' and which ultimately were so demonstrated by the fact that they did fall by the wayside." (Testimony of Morrill Cole, July 28, 1976, T. 2.78-79).
The S.E.C. has analyzed the compensability of services rendered by plan proponents at pages 22-25 of its memorandum. This discussion notes that there is case law denying compensation to counsel for a creditor-plan proponent where the efforts expended were basically attempts to acquire the debtor's property on favorable terms, efforts which may be in conflict with the interests of the debtor and other creditors. London v. Snyder, 163 F.2d 621 (8th Cir. 1947). That discussion also notes that "attorneys for creditors and stockholders who propose plans of reorganization may be allowed compensation and reimbursement of expenses for beneficial plan related services . . ." (S.E.C. memo at p. 24).
I have considered these principles as well as the general principles enunciated at the outset of this opinion, and I feel that some compensation for the intangible benefits the estate received by having this stockholder-plan proponent actively spurring or seeking to spur this proceeding to conclusion, should be awarded to this applicant. Accordingly, I have concluded that an allowance of $7,500, together with reimbursement for unreimbursed disbursements in the amount of $2,176.30 should be allowed to Cole, Berman & Belsky.

METH AND WOOD
The law firm of Meth and Wood seeks compensation for services rendered as counsel to the motel co-owners who are in partnership with Imperial at a number of the motel locations. The request initially submitted by Meth and Wood was for $25,000 plus disbursements, but at the hearing this request was reduced to $22,378 plus disbursements. The request is based upon an hourly rate of $100 per hour for partners and $50 per hour for associates. A detailed bill was submitted with the application.
The services performed by Meth and Wood were characterized by the applicant as breaking down into three major areas:
1. Co-owner counselling, resulting in co-operation to the debtor which assisted operations and led to a successful reorganization.
2. Plan work, including co-sponsorship of the Schiavone plan and review of other plans.
3. Assisting the trustee by keeping local banking mortgagee and other interests under control, avoiding administration problems to the debtor.
The plan work performed by Meth and Wood had nothing to do with the confirmed plan of reorganization concerning which the co-owners were not a co-proponent. None of the work performed by Meth and Wood concerned administration matters.
The co-owners are an essential ingredient in the operation of the Imperial chain. Nonetheless, they are partners with Imperial in the operation of the motels and are not, generally, creditors or stockholders, nor were they seeking to protect what creditor or stockholder interests they might have as much as they were seeking to protect their partnership interests. In some measure, therefore, the counseling by Meth and Wood was to a private interest as opposed to work that is normally compensable as a reorganization administration expense.
Meth and Wood have received $12,000 from the co-owners against the $22,378 worth of services performed. This leaves an uncompensated portion of their work of $10,378 (although they seek the full value of their services from the estate). Meth and Wood have no specific agreement for reimbursement of the co-owners if more than the uncompensated portion of the allowance sought by that firm is awarded. *168 Based upon the foregoing and the general principles applicable to these proceedings, I conclude that the sum of $10,000 is an appropriate allowance, together with reimbursement for expenses in the amount of $1,105.94.

SCHIAVONE CONSTRUCTION COMPANY
Schiavone Construction Company seeks reimbursement for $477,877 it has paid to its attorneys for their efforts in these proceedings, together with reimbursement for disbursements in the amount of $37,928.61 (including $10,000 bill submitted by Arthur Anderson & Co.).
Schiavone seeks reimbursement under Section 242 of the Bankruptcy Act and Bankruptcy Rule 10-215 on the premise that they were a "party in interest" that rendered beneficial services to the estate. The term "party in interest" is not defined in either the Bankruptcy Act or the Bankruptcy Rules, including the Advisory Committees' note on Bankruptcy Rule 10-215. The S.E.C., in its memorandum, suggests that the term "party in interest" is limited to creditors or stockholders, or their representatives or committees. The S.E.C. concludes, at pages 23-24 of its memorandum:
"Accordingly, only persons who, like a creditor or stockholder, has a financial interest in a debtor, or who has a cognizable administrative interest falls within its scope."
I am not inclined to totally disallow any award for any beneficial services rendered to this estate by Schiavone or its representatives on the grounds that it did not have the technical status of creditor or stockholder in these proceedings. If, by the mere purchase of a nominal amount of stock or claims, Schiavone would be entitled to reimbursement, such as other plan proponents in these proceedings, I see no reason to disqualify Schiavone on the grounds that they did not hold such an interest. Conversely, I do recognize that the primary motive of Schiavone was to acquire control of the debtor for its monetary gains, and I therefore conclude that Schiavone should bear its own costs, including legal fees, almost in their entirety. Nonetheless, Schiavone was a co-proponent with the trustee and the Co-owners Committee of a plan that was approved by this Court, and I therefore feel it would not be improper to expand the meaning of "party in interest" to include Schiavone within its definition. I therefore pass to the question of what benefits, if any, were conferred upon the estate by the activities of Schiavone and its representatives.
From the time of its proposal of a plan until that plan ultimately failed of confirmation, Schiavone was a very active party in these proceedings. Schiavone was of great assistance to the Court in the presentation of proofs with respect to the value of the debtor corporation, a determination that was necessarily precedent to analysis of various plans as to their fairness and feasibility. Moreover, Schiavone's representatives assisted the Court in the analysis of all pending plans and helped to shed some light on questions which arose as to stock ownership, status of stockholders and related questions.
More importantly, however, Schiavone was the proponent of a plan which was found by this Court to be fair, equitable and feasible. In Re Imperial `400' National, Inc., 374 F.Supp. 949 (D.N.J.1974). Schiavone assisted this Court in reaching the conclusion it reached in that opinion through the presentation of proofs, witnesses, evidence and financial information. Schiavone assisted this Court in establishing the principles which ultimately governed all plans submitted, including the internal plan which was confirmed on April 30, 1976. This Court received the benefit of all the data and investigatory materials developed and gathered by Schiavone and put before the Court. These efforts brought these proceedings considerably closer to a conclusion and many of the elements of the Schiavone plan were built into the confirmed internal plan.
For the foregoing reasons, and in light of the specific provisions of Section 242 of the Bankruptcy Act and Bankruptcy Rule 10-215(c)(1)(B), *169 both of which refer to services which contribute to a plan which is approved, whether or not such plan is confirmed, I deem an award of $25,000 to Schiavone Construction Company on account of its efforts which benefited the estate to be an appropriate award. The request for reimbursements is disallowed.

SAIBER, SCHLESINGER AND SATZ
The law firm of Saiber, Schlesinger and Satz seeks an allowance for services rendered in these proceedings. This law firm primarily represented American Realty Trust, a major stockholder and plan proponent, and also performed services for Mr. William Brakefield in connection with certain matters. The firm indicates it has performed certain services and sent bills to its clients aggregating $93,688.92, including disbursements. Against this amount, Saiber, Schlesinger and Satz has been paid $68,688.92, leaving an open balance of $25,000. The firm seeks to have all its services paid by the estate and not merely the $25,000 open balance.
Saiber, Schlesinger and Satz has performed 1,092.6 hours of services, approximately ninety-percent of which is comprised of partner hours. The services were performed in three capacities:
1. As a plan proponent;
2. As an opponent to other plans; and
3. As a "party in interest."
With respect to the first category, the S.E.C. has summarized its views at page 24 of its memorandum:
"Attorneys for creditors and stockholders who propose plans of reorganization may be allowed compensation and reimbursement of expenses for beneficial plan related services from the assets of a Chapter X estate under Section 243 of the Bankruptcy Act. In ascertaining benefit to the estate, the judge shall consider `the services which contributed to the plan confirmed or to the refusal of confirmation of a plan.' It should be further borne in mind that services related to plans directed towards the ultimate acquisition of a debtor's assets by a plan proponent are apparently aimed at obtaining the assets at the most favorable price for that plan proponent, a goal obviously not shared by any other interested party."
For the reasons outlined below, I believe that Saiber, Schlesinger and Satz did render certain "beneficial plan related services" and I thereby deem their services to be compensable. However, since the primary representation appears to have been on behalf of a private client, ART, in furtherance of its own corporate purposes and financial objectives, the amount of the compensation for this category of services will be quite small.
Similarly, for the second category of services, opposition to other plans (primarily the Schiavone plan), I feel that the activities of ART and the representation of that entity by Saiber, Schlesinger and Satz was primarily the representation of a private client seeking to further its own ends and I will therefore give only a minimum award for this category of services.
There is no question that during some portion of the latter years of these proceedings, ART was a "party in interest". Thus, the law firm's representation of that company was the representation of a major stockholder and owner of claims against the debtor. ART had a definite "financial interest" in the debtor. See S.E.C. memorandum, at page 23. Moreover, the confirmed plan had the active support of this major stockholder and party in interest, which was an active participant in the latter phase of these proceedings, and still appears before the Court on administrative matters.
I have discarded, in my assessment of the value of the services, those hours performed by Saiber, Schlesinger and Satz with respect to analysis of the tax status of ART, obtaining I.R.S. rulings and related matters. The modest benefits that were conferred upon the estate by the legal services rendered by Saiber, Schlesinger and Satz seem to fall into the category of those services rendered in assisting the Court in plan analysis, including appraisal of the approved *170 and confirmed plan. Additionally, there were services which were of assistance to the Court in analyzing administrative applications made by the trustee. I have also taken into consideration the fact that this law firm worked with the trustee, the creditors' representatives and other stockholders to evolve and obtain approval and confirmation of the plan confirmed on April 30, 1976.
For the reasons outlined above and for the categories of services that I deem to have conferred some benefit upon the estate, all as more particularly outlined in the papers filed and testimony adduced, I feel it appropriate to award the firm of Saiber, Schlesinger and Satz the sum of $8,500 for services rendered. Disbursements have already been reimbursed by the law firm's clients.

SIDNEY A. MARKLEY AND CHARLES A. STANZIALE, JR.
Messrs. Markley and Stanziale have made an application for fees for services rendered in these proceedings on behalf of Continana Corporation. They have submitted separate applications but there is no question that their services were rendered on behalf of the same party in interest.
Mr. Markley seeks $125,920, together with disbursements, while Mr. Stanziale seeks $38,800 and disbursements. I will deal with their applications together since much of the work performed by both counsel overlaps or dovetails.
The work performed on behalf of Continana included work on the drafting and filing of an internal plan several years ago. The internal plan proposed by Continana was a straightforward distribution of stock to various creditor classes at differing values in order to recognize seniority. Originally, the Continana plan did not call for the distribution of cash, debentures or notes. I considered the Continana plan and found that it was not fair, equitable and feasible. In Re Imperial `400' National, Inc., 374 F.Supp. 949 (D.N.J.1974).
The ultimate plan was a blend of some of the ideas contained in the Continana plan looking toward an internal reorganization. These applicants did have a role in the co-sponsorship to the confirmed plan and there is no question that they worked with counsel for the trustee and counsel for the Creditors Committee to evolve the terms and conditions of the confirmed plan.
Counsel also seeks credit and compensation for the increased valuation of the corporation and of the interest of the stockholders in the corporation. The applicants were instrumental in bringing an appeal from the valuation of the debtor corporation as found by the District Court; however, the District Court's valuation determination was affirmed. See Judgment Order of the United States Court of Appeals for the Third Circuit dated October 16, 1973. However, by dint of the appeal, the applicants called attention to certain considerations pertaining to valuation which were ultimately reconsidered by me and blended into the final determination.
Additionally, counsel seeks compensation for its analysis of other plans and legal issues surrounding them, meetings with other creditors and stockholders and general participation in the administration of the estate. Finally, both Messrs. Markley and Stanziale urge the Court to reward them for the "contingent" nature of their work. I have taken this aspect of their representation into account, although I am quite cognizant of the fact that they represented a client with a substantial financial interest in the debtor corporation. Continana is not only a major stockholder in the debtor but also has options to acquire a further interest through 400 Group Limited Partnership and Imperial Associates. Moreover, Mr. Markley is a substantial stockholder in Continana Corporation and one of the two equal principal owners. Thus, his stake in the outcome of these proceedings, while somewhat contingent, was also financial and not wholly altruistic.
Mr. Markley claims to have spent 1,259.2 hours in performing the services for which he seeks compensation. However, of these hours, 250 are unrecorded estimates and *171 other gaps appear such as the 80 hours of research into the "background and financial status of the debtor" conducted by Mr. Markley prior to active interest in this estate.
Moreover, there appears to be substantial duplication of time between Mr. Markley and Mr. Stanziale. They both claim credit for the same services although Mr. Stanziale concedes that he did not begin his work in this case prior to the spring of 1973. Mr. Stanziale did perform services in New Jersey for Continana Corporation which were not wholly duplicative of those services performed by Mr. Markley; moreover, the benefits conferred by his services to some extent complemented the services of Mr. Markley and included the furthering of the confirmed plan, the participation in valuation considerations, etc.
One further factor must be considered. Mr. Markley indicated that any fees received by him and Mr. Stanziale would be split one-third in favor of Mr. Stanziale and two-thirds in favor of Mr. Markley. The Court cannot necessarily approve such a fee-splitting arrangement and I will therefore merely award an allowance based upon what I deem to be reasonable compensation for services rendered to the individual applicants.
Based on the foregoing, I hereby award Sidney M. Markley the sum of $40,000 for fees and $1,265.81 for disbursements.[5] I hereby award Charles A. Stanziale, Jr., a fee award of $18,000, together with disbursements in the amount of $230.70.

WALSH AND LEVINE
The firm of Walsh and Levine represented Union Bank of California throughout these proceedings. A member of the firm, Laurence W. Levine, was a member of the Executive Committee of the Creditors Committee, served as Chairman of the Creditors Committee, and was an active participant in these proceedings. The voice of Union Bank, through its counsel, was frequently heard during the administration, and often made a substantial contribution to the decision-making process undertaken by the Court, both on plan matters and administrative matters.
Walsh and Levine seek $270,000 in fees and $19,694.62 in disbursements. The Union Bank has reimbursed Walsh and Levine all disbursements paid by it to date, and has paid Walsh and Levine $100,000 in counsel fees, of which $55,000 may be deemed to be on account of the services for which the application is submitted. The balance was for a related but separate matter for which no compensation was sought.
Walsh and Levine estimates it spent approximately 3,600 hours in performing the services outlined in its detailed affidavit. The affidavit is supported by numerous summaries of work performed, some of which have detailed hours. I am satisfied that the estimated hours are sufficiently grounded upon reason and actual time records as to permit the view that they were, in fact, spent.
The Walsh and Levine affidavit breaks down the time expenditure into five categories. Specific estimates of hours are included for each category and credit is claimed for the work in each category as having benefited the estate.
The first category recites 50 hours expended in opposition to the Trustee's application to settle the General Tire claim for $600,000: $100,000 down and $500,000 through short term debt. It is claimed that the estate benefited from this opposition by preserving cash and preventing the creation of short term debt. While this is true, General Tire ultimately did receive in excess of $2,400,000 in cash and notes under the plan, so that it is difficult to conclude that the opposition to this settlement was a distinct benefit. Nonetheless, the legal *172 work did focus the attention of the Court on the cash flow and cash needs of the debtor and did preserve working capital. However, the award I will ultimately make will not give a great deal of weight to this area of legal services.
The second category relates to opposition to an offer to sell the Las Vegas motel in 1970 which was placed before the Court. The offer was, in fact, turned down and the Las Vegas motel has remained one of the more valuable properties in the Imperial chain. Twenty-seven hours are ascribed to this service.
The Walsh and Levine firm indicates it spent 651½ hours on the category of third interim allowances to the trustee and trustee's counsel, including interest on those awards. These services did result in the replacement of certain operating cash into the estate, clarified some of the very principles which are being utilized as criteria by me in this opinion and set the stage for the expeditious handling of the latter phase of this reorganization proceeding. In my view these services did confer some benefit upon the estate.
The fourth category of services relates to 743 hours spent from 1968 to 1971 as counsel to the Union Bank and as chairman of the Creditors Committee in reviewing various plans submitted or proposed. I feel that the bulk of this work was rendered on behalf of a private client, the Union Bank, insofar as it was an evaluation of the treatment of the Union Bank under each of these plans. However, since Mr. Levine also served as chairman of the Creditors Committee, his services necessarily were on behalf of all creditors and I therefore am able to make an award that is partially based upon these services. It is necessary in a proceeding of this sort that the creditors have a "watchdog" which includes both their committee and their counsel. I feel Mr. Levine performed effectively in this role not only with respect to the review of plans but also with respect to consideration of the numerous administrative applications placed before the Court.
The final category of services relates to legal analysis of the Schiavone plan and the internal plan which was finally approved and confirmed. This work aggregated 2,299.5 hours and is the true heart of the body of services for which an award may properly be made. I am aware of the active role that Mr. Levine played in analysis and negotiation of the terms of these respective plans. Moreover, the internal plan which was ultimately confirmed bears the co-sponsorship of the General Unsecured Creditors Committee which Mr. Levine continues to chair. While there is necessarily some duplication in the legal work performed by Mr. Levine and that performed by Mr. Schachter as attorney for the Creditors Committee, I do not find the work to be so duplicative as to preclude an award; rather, I find that Mr. Levine's contributions were insightful, fresh and complementary to those of Mr. Schachter.
Mr. Levine continues to serve as a director on the Interim Board of Directors of Imperial. He does not seek compensation for these services, but I would be remiss if I did not recognize this continued dedication to the success of the reorganization. Taking into account all of the foregoing factors, and being mindful of the fact that the representation of Walsh and Levine was primarily that of the second largest creditor, yet nonetheless beneficial to the entire estate, I deem it appropriate to award the firm of Walsh and Levine the sum of $105,000, to be paid from the estate.

KLEINBERG, MORONEY, MASTERSON & SCHACHTER
The firm of Kleinberg, Moroney, Masterson & Schachter served as attorneys for the General Unsecured Creditors Committee throughout these proceedings. This firm was an active participant for the entire time that Imperial has been under the jurisdiction of the Court. For services rendered, the firm requests an allowance of $350,000, together with reimbursement for disbursements in the amount of $1,967.63.
The firm of Kleinberg, Moroney, Masterson & Schachter, and particularly Mr. Sheldon *173 Schachter of that firm, has been one of the most active participants in this case. They have attended virtually every Court proceeding and have vigorously probed and analyzed each and every plan put before the Court. The firm has submitted a detailed affidavit with considerable daily detail and time records. The services are summarized in 28 pages which reflect the highlights of the work performed by the applicant.
The Creditors Committee was originally constituted as a large group, but through death, disallowance of claims and attrition, it dwindled down to a smaller number. The most active organ of the Creditors Committee was its Executive Committee, comprised of Mr. Levine of Walsh and Levine, Mr. Pittenger on behalf of General Tire and Mr. Schachter. I am satisfied that this group was active, was in constant communication and, from time to time, communicated with the Creditors Committee as a whole with respect to pending matters. I am also satisfied that Mr. Schachter and his firm capably represented the interests of all general unsecured creditors and did not compromise the interests of any senior or subordinate element of the creditor body.
Some of the highlights of the activities of the firm of Kleinberg, Moroney, Masterson & Schachter which contributed a benefit to the estate included opposition to the sale of the Las Vegas motel, participation in the debenture conversion dispute, opposition to the application to purchase the General Tire claim for $600,000 (albeit a mixed blessing in hindsight), participation in the Benton Harbor dispute sustaining the jurisdiction of a reorganization Court over property in which the company in reorganization has a partnership interest, participation in a lease dispute pertaining to Benton Harbor and various other administrative matters.
However, I feel that the greatest contribution and benefit conferred upon the estate by the applicant was its involvement in both the valuation proceedings and the evolution of the confirmed plan. With respect to valuation, this Court had before it the conflicting views of creditors and stockholders. It is axiomatic that creditors would contend for a valuation that leaves little or no equity for stockholders, so that the total value of the company would be divided up among creditors only. Conversely, stockholders would contend for as large a valuation as possible, in order to indicate to the Court that the equity position of stockholders was substantial and warranted a major distribution under any plan equivalent to their equity interest. The applicant provided considerable assistance to the Court on financial issues both through cross-examination of various financial experts and through the submission of comprehensive briefs which assisted the Court in reaching the ultimate valuation determination. In my view, the valuation determination was the result of an adversary process in which this applicant was a most illuminating contender.
Secondly, the purpose of the reorganization proceeding is the formulation, approval and confirmation of a plan. Mr. Schachter and his firm were deeply involved in the various plans put before the Court and participated in assisting the Court in making determinations on the fairness and feasibility of those plans. Negotiations for amendment of plans were an ongoing process in this case, in order to satisfy both the statutory criteria and the interests of all parties. Mr. Schachter performed ably in this field. The conclusion of these efforts was the filing of the joint plan of reorganization sponsored by the trustee, Continana Corporation and the General Unsecured Creditors Committee for which the Kleinberg firm was counsel. The plan has been found fair and feasible, has been confirmed (including an overwhelming favorable vote by general unsecured creditors) and is nearly consummated. A considerable amount of the credit for the success of the plan is attributable to this applicant.
The firm indicates it has expended 2,791.72 partner hours and 28.30 associate hours in performing its services. Of these hours, 466 hours were spent on plan hours and 97 hours were spent on the confirmed internal plan. Considering these hours and all the *174 factors outlined above as well as the general criteria expressed herein, I hereby award the firm of Kleinberg, Moroney, Masterson & Schachter the sum of $250,000, together with reimbursement for disbursements in the amount of $1,967.63.

THOMAS J. O'NEILL
Thomas J. O'Neill was appointed trustee in reorganization on February 21, 1966. He served in that capacity until November 19, 1975 when he was succeeded by Eugene L. Boyle. During that time period, Mr. O'Neill has produced daily time records indicating that he performed 9,898.3 hours of services. There are additional services recounted in the petition for which no compensation is sought, particularly that period from June 20, 1975 to November 19, 1975 when Mr. O'Neill was otherwise employed but nonetheless active in the operation of the debtor. Additionally, Mr. O'Neill served as attorney pro se from May through October of 1972, the period between Mr. Nolan's resignation and the appointment of Crummy, Del Deo, Dolan and Purcell.
Mr. O'Neill has computed the amount of money he would have been paid at his normal hourly rate as an attorney, and the total value of the services thus computed aggregates $911,139. However, the application is considerably scaled down from that amount. Mr. O'Neill has also computed what he feels to be typical annual compensation that would be paid to a chief executive officer of a public corporation grossing in excess of $10,000,000 per year and having made profits in excess of $5,000,000 throughout the reorganization. The annual compensation that he projects commences in 1966 at a rate of $55,000 per year and ends in 1975 at $75,000 per year. Based upon this analysis, Mr. O'Neill has submitted his request for a $600,000 final allowance. He has received $117,500 to date and therefore requests an additional allowance at this time of $482,500. The appendix to the brief submitted by counsel for the Trustee supports the range of annual compensation used by Mr. O'Neill in his request. Thus, compensation for chief executive officers of hotel-motel public companies, during the years 1973 and 1974 ranged from a low of $40,000 to a high of $110,000. The median appears to be in the $50,000 to $60,000 per year range. Of course, this compensation is exclusive of fringe benefits, stock options and other executive compensation that might have occurred within the corporations cited in the appendix.
The submission of this information both in the request by the trustee and the submissions of counsel is consistent with case law indicating that compensation received by chief executive officers in a similar enterprise should be given due consideration. As the Court stated in In re Westec Corp., 313 F.Supp. 1296 (S.D.Tex.1970), at page 1300:
"The Court is of the opinion that the Trustee should be regarded as performing the functions of a corporate executive and should thus be compensated on a scale which bears some reasonable relationship to the amount of compensation paid by similar corporate enterprises to their chief executives. That is to say, the compensation in such a case should not exceed the market value of similar executive services yet, it may be trimmed down or reduced to take into account the ultimate losses sustained by creditors or stockholders."
In the instant case, creditors and stockholders received full value and I therefore conclude that there is no requirement, other than principles of economy, mandating the trimming of compensation to the trustee.
The details of the services of the trustee are analyzed in the petition and were expanded upon during the hearings. I find that Mr. O'Neill performed the services of trustee in a competent and efficient manner. The financial success of the debtor company and the success of the plan are in large measure attributable to Mr. O'Neill. Under his stewardship, the company went from a loss operation to one which is presently averaging a net income in the range of $1,000,000 before taxes. It was based upon this improved operation and the *175 projection of profits in the short range future that the Court was able to determine the feasibility of the post-reorganization company. Future profits will support the debt obligation issued pursuant to the plan.
To achieve this sort of financial result, the trustee had to devote himself to the management of the company. His operational supervision of the entire motel chain, of co-owner relationships, of corporate personnel, of financial and accounting matters, of invested funds, of trends with respect to individual motels, and of a myriad other operational matters required skill and attention. Additionally, the purchase or sale of motel interests were necessary in order to obtain greater ownership interests in profitable motels or limit liability with respect to declining properties.
The services of Mr. O'Neill as trustee included unusual land financing techniques including land leasing, subordinations, varying ownership interests, etc. Certain problems posed were exceedingly complex and were litigated to high courts, such as the Supreme Court of the State of Oregon. Additionally, battles with partners or co-owners raged during the early phases of the proceedings, especially in connection with certain motels under construction at the time of the filing of the Chapter XI proceedings.
Mr. O'Neill was an active participant, indeed a witness in various aspects of the classification, valuation and plan hearings before me. The problems involved in these proceedings were complex and unique.
Finally, I am satisfied that Mr. O'Neill was an active party in the efforts to obtain a fair and feasible plan and place it before the Court. He indicated he discussed with more than fifty parties possible plans of reorganization. The plan that was ultimately approved and confirmed bore the mark of many of the earlier plans, and was originally co-sponsored by Mr. O'Neill as trustee. I based the bulk of my findings of fairness and feasibility upon the testimony of Mr. O'Neill and his staff who had a coherent and comprehensive grasp of both corporate and Chapter X finances.
The S.E.C., in their Advisory Report dated July 12, 1972, (Corporate Reorganization Release No. 312) discussed the administration of the trustee in the following language (at pages 15-17):
"The Trustee brought the expansion program to a halt. He ended the drive to enlist new co-owners. The Trustee took what had heretofore been a promotional affair and made it into a rather staid motel chain. He disposed of 17 unprofitable motels. When he considered it desirable to do so, he purchased the co-owners' interests. Twenty-six motels formerly owned by partnerships with co-owners are now wholly owned by Imperial.
* * * * * *
The marked improvement shown by [Table of Income 1966-1971] reflects the progressive elimination from the chain of uneconomic units.
* * * * * *
Imperial is now a viable entity.* There is no need for further seasoning. The company is ripe for reorganization."
* Its viability was far from clear when the proceedings began. At that time sophisticated creditors argued that Imperial was unreorganizable.
The testimony before me and the entire record of these proceedings bear out the value that the services of Mr. O'Neill have had to the estate. See, also, opinion of Judge Shaw, In the Matter of Imperial `400' National, Inc., 333 F.Supp. 742 (D.N.J.1971). Mr. O'Neill is a seasoned practitioner in the area of Chapter X and XI and I find that he needed both this experience and all of his professional skills to deal with the unique and difficult problems encountered in this estate.
For the foregoing reasons, and based upon the criteria enumerated throughout this opinion, I award Mr. O'Neill an additional allowance of $310,000, which, together with the $117,500 previously awarded to him, gives him a total allowance in this estate of $427,500 for the almost ten years of continuous and extensive service rendered by him in these proceedings.

*176 JOSEPH M. NOLAN
Joseph M. Nolan served as attorney for the trustee for the period from February 24, 1966 to May 2, 1972. Mr. Nolan has had broad experience in Chapter X and Chapter XI work, and is a respected member of the Bar. He recently served as President of the New Jersey State Bar Association and presently serves as a New Jersey Commissioner on the National Conference of Commissioners on Uniform State Laws. He seeks an allowance for services and disbursements aggregating $640,290.50, and has received $213,145.00, leaving a net request before the Court of $427,145.50.
A comprehensive review of all but the last year of Mr. Nolan's services was set forth by the late Judge Robert Shaw in his opinion on the request for a fourth interim allowance by the trustee and his counsel. In re Imperial `400' National, Inc., 333 F.Supp. 742 (D.N.J.1971). In that opinion, Judge Shaw carefully detailed the state of affairs that confronted the trustee and his counsel at the beginning of the Chapter X proceeding and analyzed some of the Herculean efforts that were necessary to deal with some of the enormous problems with which they were then confronted. As Judge Shaw commented in his opinion (at page 745):
The complexity of the affairs of the Debtor were not fully conceived at the time the Chapter XI petition was dismissed.
Judge Shaw briefly noted some of the "vexatious problems" with which counsel for the trustee had to deal, including recovery of assets which were being lost by methods of accounting, discovery and funds which had been misapplied and actions to compel turnover, attempts of co-owners to misappropriate funds and resist control of management and threatened mortgage foreclosures and the application of varying state laws in thirty-eight states. Further quotation from Judge Shaw's opinion is unnecessary. Based upon his personal knowledge, Judge Shaw saw fit to highly praise the quality of the professionalism that Mr. Nolan brought to the office of counsel for the trustee. My independent review of the detailed affidavit and exhibits submitted by Mr. Nolan in connection with his application bears out the conclusions of Judge Shaw. The following hours were performed by partners and associates in Mr. Nolan's firm:

Joseph M. Nolan - 6,522 hours
Jerome M. Lynes - 1,146.4 hours
James M. Bell - 121.4 hours
Daniel J. Moore - 42.3 hours
Ernest R. Nuzzo - 1,596.6 hours
(as partner)
Associate hours - 3,452.5 hours

I am satisfied that the hours performed by Mr. Nolan and members of his firm were proper, were professionally performed and were necessary for the administration of the estate. Moreover, I find that substantial benefits were conferred upon the estate by the efforts of Mr. Nolan and his firm. See, for example, Exhibit N-28 of October 18, 1976. The estate obtained substantial value from the efforts of Mr. Nolan with respect to the Little Rock motel which was virtually out of the estate when Mr. O'Neill and Mr. Nolan were appointed. Only through their diligent efforts was it recovered and it is still a part of the Imperial enterprise. Additionally, Mr. Nolan's efforts with the trustee resulted in the cancellation of certain promotional stock, enhancing the ultimate distribution to stockholders pursuant to the plan. Further details could be given, but they are set forth in the transcripts and exhibits of the fee hearings. I am satisfied that all work was capably performed and did confer substantial benefits upon the estate. While Mr. Nolan did not participate in the proceedings pertaining to the plan which was ultimately confirmed by this Court, I am convinced that the viability of Imperial as an entity was greatly enhanced by the activities of Mr. Nolan, thus leading to the ability of subsequent counsel to develop the internal plan confirmed by this Court.
One final note deserves mention in connection with Mr. Nolan. There is no question that a major collateral dispute arose between Mr. Nolan and others pertaining to counsel fees, interest on counsel fees, conflict of interest questions and related matters. These aspects of the case have been *177 detailed elsewhere and I feel no compulsion to reopen this aspect of the case. See, e. g., In re Imperial `400' National, Inc., 481 F.2d 41 (3d Cir. 1973), reh'g den., 486 F.2d 297 (3d Cir. 1973). I would only state that in my view, Mr. Nolan carried out his duties competently, faithfully and with a high degree of skill. I make this statement in recognition of the high standard that a Court-appointed fiduciary must meet and after a full examination of the history and evidence in this case. Moreover, I would note that no compensation is sought for any of the time expended in these collateral disputes referenced above.
Based upon the foregoing analysis, I have reached the determination that Mr. Nolan should receive an additional award at this time of $250,000. This sum, together with the interim allowances he has received aggregating $213,145, brings his total compensation to $463,145. This is a substantial discount from the total amount of services rendered at what I consider to be very reasonable rates employed by Mr. Nolan and members of his firm, but the many criteria outlined in this opinion mandates an award in this amount, and no greater.

EUGENE L. BOYLE
Eugene L. Boyle has submitted two applications for compensation. The first application seeks compensation for the period from the date of his appointment on November 19, 1975 to the date of confirmation of the plan, April 30, 1976. The second, supplemental application, recites the services performed from May 1, 1976 through December 31, 1976, and estimates the additional services to be performed to conclude consummation of the plan of reorganization and transition to new management of the reorganized company. For the first period, Mr. Boyle seeks $37,500, and for the latter period, an additional $30,000, or a total of $67,500 as a final allowance.
During the earlier period for which the original petition was filed, Mr. Boyle worked full time at Imperial `400' as its Chief Executive Officer. During the latter period, he indicates he is spending 15 to 20 hours per week on Imperial matters, including continuing as the Chief Executive Officer pursuant to the selection of the Interim Board of Directors, participation in Board of Directors meetings as a director, working with counsel in conjunction with Court proceedings and continuing field operations by traveling to various motel locations.
While the plan was formulated prior to Mr. Boyle becoming trustee, the final amended version of the plan was filed during his administration, subsequently approved and later confirmed. Mr. Boyle had some involvement in the final negotiations of the final terms of the plan and worked with counsel and his staff in the preparation of testimony and evidence sufficient to sustain approval and confirmation.
His services as Chief Executive Officer of the debtor throughout the period included working with the co-owner operating partners, financial supervision of the debtor, supervision of motel operations, travel to "problem motels", overseeing of personnel, dealings with creditors and participation in Court. In my view, he has rendered these services capably and thoroughly. The debtor corporation has continued its successful operations and profitability under Mr. Boyle's stewardship and, as we approach consummation of the plan, Mr. Boyle will turn over a viable operating entity to new ownership. I am satisfied that Mr. Boyle has performed the services of trustee in a capable and competent manner. I have considered all of the criteria enumerated in this opinion in analyzing Mr. Boyle's applications and I have concluded that an award of $52,500 is appropriate.

CRUMMY, DEL DEO, DOLAN & PURCELL
The law firm of Crummy, Del Deo, Dolan & Purcell has filed both a petition and a supplemental petition analyzing the services that law firm performed since its appointment in these proceedings. Included in the supplemental petition is an estimate of additional time to be performed in consummating the plan and arranging for an orderly transition to legal counsel retained *178 by the Reorganized Company. This estimating procedure was suggested by the S.E.C. in order to permit the Court to make a final allowance at this time.
Crummy, Del Deo, Dolan & Purcell was appointed as counsel for Thomas J. O'Neill, former trustee, on October 11, 1972, served as counsel for the trustee for the balance of Mr. O'Neill's administration and thereafter represented Eugene L. Boyle, the current trustee and Chief Executive Officer of Imperial. The application filed by Crummy, Del Deo, Dolan & Purcell contains detailed time records listing date, service, attorney performing service and hours expended. The services detailed in these time records are extensive.
As attorney for the trustee, Crummy, Del Deo, Dolan & Purcell had the burden of seeing to it that these proceedings moved as rapidly as possible toward a conclusion. This case had been under the supervision of the Court for more than seven years prior to the applicant's appointment. Since that date, this Court has been able to deal with the issues of classification, valuation and plan matters, all of which involve complex and technical legal and financial questions. The firm of Crummy, Del Deo, Dolan & Purcell was of great assistance to the Court in analyzing the factual and legal issues, moving the parties forward and bringing these proceedings to their successful conclusion.
The services rendered by the applicant break down into two major categories: administration and plan matters. With respect to administrative matters, Crummy, Del Deo, Dolan & Purcell, performed the responsibility of both in-house counsel and outside counsel in their representation of the debtor. Imperial has a great number of legal relationships with co-owners, landlords, mortgagees, and various other parties in conjunction with motel financing. Similarly, there are numerous transactions that the individual motel partnerships have with third persons. Many of these erupt into legal disputes, require reformation or revision, or generally require legal counseling of the trustee and Chief Executive Officer in order to protect the interests of the company. Additionally, co-owner transfers and purchases or sales of motel interests are an on-going activity of Imperial, requiring negotiations, legal and financial analyses and court proceedings. In some cases, motel interests had to be abandoned in order to protect the interest of creditors and stockholders. Furthermore, as in any corporate setting, litigation would occur from time to time, notwithstanding the protection of Chapter X, and counsel has been called upon to protect the rights of Imperial in such litigation, as well as initiate litigation when necessary.
Crummy, Del Deo, Dolan & Purcell also had dealings with the Indenture Trustee, bank depositories, Internal Revenue Service, creditors and accountants. In summary, the administrative phase of the work of Crummy's firm ran the whole gamut of legal services, many aspects of which required sophisticated legal skills in areas such as tax and Chapter X law. Additionally, the administrative work performed by Crummy, Del Deo, Dolan & Purcell required some travel to motel locations to enforce the rights of the company or structure a transaction. I am satisfied that the administrative work performed by this firm was extensive and was competently performed.
The work performed by the law firm in conjunction with proposed plans included participation in the extended hearings held on the Burnham, Continana, ART and Schiavone plans. Subsequently, when the Schiavone plan, which was co-sponsored by the trustee, was approved, counsel for the trustee worked on further negotiations in an effort to persuade creditors and stockholders and the plan proponents to reach an accord and get this case out of court. When this failed, counsel for the trustee worked diligently with counsel for the General Unsecured Creditors Committee and Continana Corporation to evolve an internal plan that would be fair, equitable and feasible and also would, if approved, be attractive to the various classes of creditors and stockholders. I am satisfied that the work performed by this firm in conjunction with *179 the various plans and particularly, with the internal plan, was highly professional, was capably performed and contributed in great measure to the ultimate approval and confirmation of the internal plan.
The Court not only had the benefit of the negotiating and drafting performed by Crummy, Del Deo, Dolan & Purcell, but also their assistance in evaluating plans as to fairness and feasibility, considering the value of the net operating loss carry forward and its preservability, and numerous other legal issues. I am happy to say that during the course of my administration, only one appeal was argued in the United States Court of Appeals for the Third Circuit, among the numerous matters decided by me. That matter, which involved the valuation of the company, was affirmed. Crummy, Del Deo, Dolan & Purcell briefed and argued that appeal in support of the decision below. Moreover, considering the numerous appeals of decisions that took place in the earlier years of the administration of this Chapter X, I must attribute some skill to this applicant's ability to blend the respective adversary interests of the numerous participants in this case to avoid further hostility and work toward a common goal.
By the end of the case, this law firm applicant, which was a "latecomer" compared to some counsel, had a firm grasp on all aspects of the proceeding and presented all the necessary proofs on each and every matter that was before the Court. I feel that the quality of the work performed and the direct route to a successful reorganization taken after this law firm was appointed warrants strong consideration in my allowance determination.
Following the confirmation of the plan on April 30, 1976, Crummy's firm has not seen its role lessen. The substantial additional work performed and estimated to be performed is detailed in the supplemental petition of the applicant. Several points deserve note. First of all, almost immediately following the confirmation of the plan, there were a series of tender offers for the stock of the Reorganized Company. This was a complex matter since the tenders were governed by a newly-enacted Delaware statute which had yet to be tested. While special counsel were also appointed to assist, I am satisfied that this matter was capably handled and that Crummy, Del Deo, Dolan & Purcell had a share in both the responsibility and the credit for its proper handling. Secondly, the applicant prepared a Trust Indenture that has qualified under the Trust Indenture Act of 1939 with the S.E.C., and has also coordinated the supporting documentation required under the Act. This Trust Indenture is the basic instrument for the $4,632,000 worth of notes to be issued pursuant to the plan. I consider this task to be a unique and difficult job, and the measure of its performance is the qualification already obtained. Thirdly, the law firm has guided the Interim Board of Directors, the trustee and Chief Executive Officer of the company during the interim period. Now out from under the umbrella of Chapter X, this public corporation has substantial responsibilities and its law firm has heavy burdens. Fourthly, the law firm has put together an extensive challenge to the General Tire claim for additional interest which could have a substantial impact on the reorganization. Finally, the law firm has been deeply involved in numerous other matters requiring skill, expertise and diligence, including the Northern Structures matter, dealings with the old Indenture Trustee, S.E.C. compliance, I.R.S. audit, the fee hearings themselves and numerous other matters. Motel problems have continued as more particularly detailed in the Supplemental Petition. In conclusion, the work performed since the date of confirmation has been extensive and complex. I am therefore prepared to take this work as well as additional work to be performed, into consideration in reaching my final award to this law firm.
The original petition recites 2,820.9 hours performed through April 30, 1976 for which compensation at varying hourly rates (dependent upon date of performance, seniority and expertise) is sought. The total request for this initial period is $210,000, together *180 with $2,188.36 in disbursements. The supplemental petition requests an additional $140,000 (discounted from normal rates) and an additional reimbursement of $4,323.60. Of the total fee request of $350,000.00, I hereby allow the sum of $265,000.00, and I order that full reimbursement for disbursements in the amount of $6,511.96 be made.

AGGREGATE AMOUNT OF AWARDS
The Trustee has testified that, in his view, the feasibility of the plan of reorganization will not be impaired by the award of fees to the extent of 1.5 million dollars. The S.E.C. also takes the position that a ceiling should be placed on further fees at the 1.5 million dollar mark. I have used this suggested ceiling as a benchmark in making the awards set forth herein. However, I would note that substantial supplemental work has been performed by the trustee and counsel for the trustee since the date of confirmation. A reading of their supplemental applications indicates that only a few months of additional work lie ahead and these applicants have therefore found themselves in a position to submit requests for final allowances. I have reviewed these papers and I have also taken into consideration the fact that the consummation of the plan has taken and will take a better part of a year from the date of confirmation of the plan, April 30, 1976. Since Imperial has pretax earnings that have leveled off in the range of approximately $1,000,000 per year, and since the plan permits deferral of a portion of the administration expenses (see Article IX of the plan), I have not deemed myself to be completely bound by the suggestions of the trustee made a number of months ago, or the conclusions of the S.E.C. However, I have reviewed the current cash position of the reorganized company as set forth in the January 1977 report of the trustee and I note that the cash in bank, after payment of 1976 interest on the New Notes, aggregated $2,214,130.94. Taking into account the working capital needs of the reorganized company, pending claims both for and against the reorganized company, cooperative advertising funds and other financial factors, I conclude that the aggregate sum of $1,464,256.46 in fees and $19,612.77 in disbursements awarded herein is reasonable and not inconsistent with the advice of the trustee or recommendation of the S.E.C.
An appropriate order shall be submitted by counsel for the trustee forthwith. The Court does not want separate orders for each individual applicant.
NOTES
[1] See In the Matter of Imperial `400' National, Inc., 432 F.2d 232 (3d Cir. 1970); see also Lindy Bros. of Philadelphia v. American Radiation, 487 F.2d 161 (3d Cir. 1973).
[2] In the Matter of Imperial `400' National, Inc., supra, at p. 237:

"In estimating the final award, the District Court should consider economy of administration, the burden that the estate may safely be able to bear, the amount of time required, although not necessarily expended, and the overall value of the services to the estate."
See also Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 716-7 (5th Cir. 1974); Jacobowitz v. Double Seven Corp., 378 F.2d 405 (9th Cir. 1967).
Traditional factors enumerated in the cases, which I have considered include:
1. Necessary hours spent;
2. Intricacy and novelty of legal questions and opposition encountered;
3. Customary fee charged by the individual and by the local professional for the services;
4. Economical spirit of the Bankruptcy Act;
5. Size of the Estate;
6. Success of the reorganization;
7. Professional standing and reputation of the party;
8. Benefit of services to the estate.
[3] In re Yuba Consolidated Industries, Inc., 260 F.Supp. 930, 942-3 (N.D.Cal.1966).
[4] In re Hudson & Manhattan Railroad Co., 224 F.Supp. 815, 839 (S.D.N.Y.1963).
[5] The judgment order of the United States Court of Appeals for the Third Circuit dated October 16, 1973 stated that "each party shall bear its own costs in this Court." Included in Mr. Markley's request for reimbursement are numerous appellate costs including $110.00 in filing fees, $1,524.38 in printing costs and $46.40 for transcript expense. The request for reimbursement of these expenses is denied.